CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 0 5 2011

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

BEACON WIRELESS SOLUTIONS, INC., et al., )
)                    Civil Action No. 5:11-cv-00025
        Plaintiffs,                     )
)                    **MEMORANDUM OPINION**
v.                                      )
)                    By: Hon. Glen E. Conrad
GARMIN INTERNATIONAL, INC., et al.,     )    Chief United States District Judge
)
        Defendants.                     )

Beacon Wireless Solutions, Inc. ("Beacon") and Beacon Wireless Europe (UK) Limited

("Beacon Europe") (collectively, "plaintiffs") initiated this civil action on March 21, 2011

against Garmin International, Inc. ("Garmin International") and Garmin USA, Inc. ("Garmin

USA") (collectively, "defendants"). This case stems from a business relationship gone bad

between two technology companies that initially collaborated to design and market an

application that would integrate Beacon's Global Positioning System ("GPS") vehicle tracking

program into Garmin International's personal navigation devices ("PND"). The plaintiffs allege

that the defendants breached a nondisclosure agreement executed by both parties that prohibited

either party from disclosing the other party's proprietary information or from utilizing such

information for any purpose unrelated to the parties' business relationship. According to the

plaintiffs, the defendants made public the plaintiffs' proprietary information regarding the

application, thereby triggering the collapse of the application's market value to the plaintiffs.

The plaintiffs also allege that the defendants misappropriated the plaintiffs' trade secrets,

breached an implied-in-fact contract between the parties, and were unjustly enriched through the

plaintiffs' uncompensated provision of valuable services and resources from which the

defendants benefited by selling PNDs incorporating the application. On August 1, 2011, the

defendants moved the court to transfer venue to the District of Kansas and to dismiss two of the four counts in the complaint. For the reasons explained below, the court will deny the motion to transfer venue and will grant in part, deny in part, and take under advisement in part the motions to dismiss.

## Factual and Procedural History

The court will summarize the facts, as it must, in the light most favorable to the plaintiffs, the nonmoving parties. Purdham v. Fairfax Cnty. Sch. Bd., 637 F.3d 421, 426 (4th Cir. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

Beacon is incorporated under the laws of Ontario, Canada, with its principal place of business in Toronto, Canada. (Docket No. 1 at ¶ 2.) Beacon conducts business in Canada and in the United States. Beacon Europe, one of Beacon's affiliates, is incorporated under the laws of England and Wales, with its principal place of business in England. (Id. at ¶ 3.) Beacon Europe conducts business in Europe, the Middle East, and Africa.

Both Garmin International and Garmin USA are incorporated under the laws of Kansas, with their principal places of business in Kansas. (Id. at ¶¶ 4-5.) Although the plaintiffs allege that both defendants have transacted business in, contracted to supply things in, and sold goods in Virginia, the defendants deny these assertions. (Id.; Docket No. 19 at ¶¶ 7-9.) However, because the defendants station a registered agent in Virginia, they concede that this court may properly exercise personal jurisdiction over the defendants and that venue is "technically proper" in this district. (Docket No. 30 at 2 n.1.)

In 2003, the plaintiffs developed a proprietary wireless monitoring and management system, known as FleetMaster, that enabled owners of commercial vehicle fleets to track and monitor vehicles through a GPS, to monitor speed and other vehicle functions, and to

2

communicate remotely with drivers. (Docket No. 1 at ¶ 11.) The plaintiffs designed the FleetMaster system for integration with other vehicle-based devices such as PNDs.

In connection with the FleetMaster system, the plaintiffs developed a "proprietary telematics box that could interface with both North American and European mobile data networks and contained a processor that could run customized applications, including customized applications developed by the Plaintiffs that enabled secure message delivery between a PND and a host location." (Id. at ¶ 12.) The plaintiffs also developed, as part of the FleetMaster system, a "unique server and database infrastructure that could transit and store data on both North American and European mobile data networks and transmit messages to PNDs via interactive web applications." (Id. at ¶ 13.) As these facts suggest, the plaintiffs "were and are service companies, generating recurring revenues by providing customers with access to their unique server, database and network infrastructure." (Id.)

By 2005, the plaintiffs maintain, global market demand intensified for PNDs for both personal and commercial vehicles. At this same time, the plaintiffs assert, Garmin International had acquired a significant share of the PND market for personal vehicles, and was seeking to break into the PND market for commercial vehicles. (Id. at ¶ 14.) Hence, around September 2005, representatives of the plaintiffs met with representatives from Garmin International to discuss a possible business arrangement. At this meeting, the plaintiffs introduced to Garmin International the concept of developing a unique application ("Application") that would integrate Garmin International's PNDs with the plaintiffs' FleetMaster system, thereby enabling commercial fleet operators to monitor and communicate with their vehicles through a "customized interface on a Garmin International PND installed in each vehicle." (Id. at ¶ 15.)

3

Several months later, in December 2005, representatives of the plaintiffs met with representatives of Garmin International at Garmin International's headquarters in Kansas City, Kansas, to discuss the development of the Application. (Id. at ¶ 16.) During this meeting, Garmin International communicated to the plaintiffs that it wanted to develop a fleet management system as quickly as possible, but "lacked the infrastructure, expertise and time to develop an integrated fleet management system that utilized web applications and was compatible with both United States and European mobile data networks." (Id.) The plaintiffs and Garmin International agreed during this meeting to collaborate in developing, testing, and marketing the Application. (Id. at ¶ 17.) Furthermore, the plaintiffs allege, Garmin International represented to the plaintiffs that, during the development of the Application, it would "work to formalize a business arrangement that would fairly compensate the Plaintiffs for their development efforts and any commercial use of the Application." (Id.)

To facilitate the joint development of the Application, Beacon and Garmin International agreed to disclose their proprietary information to each other. (Id. at ¶ 18.) To prevent the unauthorized use or disclosure of the shared information, the parties executed on December 14, 2005 a mutual nondisclosure agreement ("Nondisclosure Agreement"), which encompasses nonpublic information regarding either entity's "know-how, hardware, software and specifications and [other proprietary] information." (Id. at ¶ 19; Docket No. 1-1 at 1.) Pursuant to the Nondisclosure Agreement, the parties agreed both that they would not disclose the other party's proprietary information without consent and that they would utilize such information only for the purpose of "evaluating a possible business relationship with the other party." (Docket No. 1 at ¶ 20; Docket No. 1-1 at 2.)

4

The plaintiffs maintain that, after the parties executed the Nondisclosure Agreement, the plaintiffs "invested significant time and resources in the development and testing of the Application, and provided Garmin [International] with extensive access to and use of the Plaintiffs' proprietary telematics hardware and firmware and to its network infrastructure and server applications, which constitute proprietary services of the Plaintiffs." (Docket No. 1 at ¶ 21.) The plaintiffs assert that they "contributed feature and design ideas, functional specifications, European-language translations, know-how, and personnel who provided extensive development services that enabled the parties to design, test and debug the Application." (Id.) Furthermore, the plaintiffs aver that they expended significant resources in assisting Garmin International to market the Application and to develop potential distribution networks. (Id.) Throughout the development of the Application, the plaintiffs allege, Garmin International conveyed to the plaintiffs representations of compensation for the plaintiffs' development efforts. (Id. at ¶ 22.)

Consequent to the plaintiffs' efforts, the parties consummated the Application by developing a fleet management system that integrated the plaintiffs' FleetMaster system with Garmin International's PNDs. (Id. at ¶ 23.) Subsequently, the defendants began in 2007 to incorporate the Application into all of their PNDs sold in North America and in Europe. (Id. at ¶ 24.)

Around May 2008, the plaintiffs discovered that Garmin International had made the Application's specifications publicly available. (Id. at ¶ 25.) Additionally, the plaintiffs discovered that Garmin International had provided to third parties information, development support, and cables, thereby facilitating the third parties' ability to utilize the Application to enable their fleet management systems to interface with Garmin International's PNDs. (Id.)

5

Garmin International's public disclosure of the Application's specifications and related information caused the Application's market value to plummet, as the plaintiffs' competitors "have been able to freely use the Application to integrate their fleet management hardware and system with [Garmin International]'s PNDs." (Id. at ¶ 26.)

The plaintiffs commenced this suit on March 21, 2011, asserting four causes of action: (1) violation of the Kansas Uniform Trade Secrets Act ("KUTSA") against both defendants, (2) breach of the Nondisclosure Agreement against Garmin International, (3) breach of an implied-in-fact contract against both defendants, and (4) unjust enrichment against both defendants. In their complaint, the plaintiffs seek a permanent injunction so as to prevent the defendants from continuing to use or disclose the Application, a full accounting of all PNDs sold by the defendants that incorporate or utilize the Application, an order imposing a constructive trust on all of the defendants' proceeds and profits from their sale of PNDs incorporating or utilizing the Application, a damages award of at least $20 million, an award of punitive damages, and an award of attorney's fees and costs.

On August 1, 2011, the defendants moved the court to transfer venue to the District of Kansas and to dismiss the counts for breach of an implied-in-fact contract and for unjust enrichment. The defendants also filed on that day their answer to the complaint, conceding that this court may exercise jurisdiction as to both defendants and that venue is technically proper in this district. However, the defendants deny liability and also advance a litany of affirmative defenses. On August 30, 2011, the court heard oral argument on the defendants' motions. Both parties have since filed briefs in response to the hearing. The defendants' motions are therefore ripe for disposition.

After considering the briefs in support of and in opposition to the motions, the parties' arguments at the hearing, and the parties' briefs following the hearing, the court will deny the defendants' motion to transfer venue and will grant in part, deny in part, and take under advisement in part the defendants' motions to dismiss.

### Discussion

**A.      Motion to Transfer Venue**

**1.      Legal Standard**

The court must analyze a motion to transfer venue under 28 U.S.C. § 1404(a).  That section provides that, for the convenience of the parties and witnesses and where the interests of justice would be served, a district court may transfer a case to another district or division within a district where the case might have been brought.  See Finmeccanica S.p.A. v. Gen. Motors Corp., No. 1:07-cv-794, 2007 WL 4143074, at *2 (E.D. Va. Nov. 19, 2007) ("In applying Section 1404(a), a district court must first decide whether the claims might have been brought in the transferee forum." (citations omitted)).  In applying § 1404(a), the decision to transfer a case rests soundly within the discretion of the district court.  Brock v. Entre Computer Ctrs., Inc., 933 F.2d 1253, 1257 (4th Cir. 1991); S. Ry. Co. v. Madden, 235 F.2d 198, 201 (4th Cir. 1956); Simmons v. Johnson, No. 7:05CV00053, 2005 WL 3159555, at *1 (W.D. Va. Nov. 22, 2005).

The United States Court of Appeals for the Fourth Circuit and United States District Courts in Virginia have elaborated on the factors that are properly considered in assessing when a transfer is truly convenient and in the interests of justice.  S. Ry. Co., 235 F.2d at 200-01; Gen. Creation LLC v. Leapfrog Enters., Inc., 192 F. Supp. 2d 503, 504-05 (W.D. Va. 2002); Verizon Online Servs., Inc. v. Ralsky, 203 F. Supp. 2d 601, 623 (E.D. Va. 2002).  As a general matter, the plaintiff's choice of venue commands deference.  Doe v. Connors, 796 F. Supp 214, 221

7

(W.D. Va. 1992); see also Akers v. Norfolk & W. Ry. Co., 378 F.2d 78, 80 (4th Cir. 1967) ("Of course, we recognize the primary right of the plaintiff to choose his forum, a selection not easily to be overthrown.").  However, the plaintiff's choice of venue demands less deference when the suit is not filed in the district and division in which it resides, Glamorgan Coal Corp. v. Ratners Group, PLC, 854 F. Supp. 436, 437 (W.D. Va. 1993), or when little exists to connect the chosen forum with the cause of action.  Se. Textile Mach., Inc. v. H. Warshow & Sons, Inc., No. 4:05CV00066, 2006 WL 213723, at *2 (W.D. Va. Jan. 27, 2006) (citations omitted).  Although the degree of deference due to the plaintiff may vary, the defendant nonetheless still shoulders the burden "to show that 'the balance of equities is in [its] favor [and] that judicial economy and convenience to all parties favor suit in another forum.'"  Doe, 796 F. Supp. at 221 (quoting Eldridge v. Bouchard, 620 F. Supp. 678, 684 (W.D. Va. 1985)).  Federal courts in Virginia often assess the following factors in determining whether the balance of equities favors transferring a case to a different venue:  (1) the convenience of the witnesses; (2) the convenience of the parties; (3) systematic integrity; (4) fairness; (5) the availability of compulsory process; (6) the cost of obtaining the attendance of witnesses; (7) ease of access to sources of proof; and (8) the interests in having local controversies decided at home.  Optical Cable Corp. v. Mass. Elec. Constr. Co., 21 F. Supp. 2d 582, 592 (W.D. Va. 1998).  The weight accorded to these factors should correspond with the degree that each impacts the policy behind section 1404(a)—to make the trial "easy, expeditious[,] and inexpensive."  Glamorgan Coal Corp., 854 F. Supp. at 437 (citation omitted).

8

## 2.  Analysis

A consideration of the balance of equity factors, as described below, results in the court's conclusion to retain venue in this district and, accordingly, to deny the defendants' motion to transfer venue.[1]

### a.  Convenience of the witnesses

The convenience of the witnesses factor weighs in favor of retaining venue in this district.  The defendants list five potential witnesses, all of whom are employed by the defendants and reside in Olathe, Kansas, approximately twenty-five miles from the federal courthouse in Kansas City, Kansas, and approximately one thousand miles from the federal courthouse in Harrisonburg.  (Docket No. 14 at 5.)  Although retaining venue in this district will inconvenience the defendants' party witnesses by obliging them to travel from Kansas to Virginia, "courts have repeatedly emphasized that in considering whether to transfer a case under 28 U.S.C. § 1404(a), the inconvenience to party witnesses is not afforded the same weight as the inconvenience to non-party witnesses."  USA Labs., Inc. v. Bio-Engineered Supplements & Nutrition, Inc., No 1:09cv47, 2009 WL 1227867, at *4 (E.D. Va. May 4, 2009) (citations omitted); see also Lycos, Inc. v. TiVo, Inc., 499 F. Supp. 2d 685, 693 (E.D. Va. 2007) ("When considering the convenience of witnesses, this court draws a distinction between party-witnesses and non-party witnesses and affords greater weight to the convenience of non-party witnesses." (citation omitted)).  The plaintiffs identify the only nonparty witnesses in this case, one of whom resides in France and the other of whom resides in Toronto, Canada.  (Docket No. 22-1 at ¶ 11(ii), (iv).)  A witness flying from France to Kansas City would travel an additional 600 miles than if the witness was flying to Washington, D.C.  A witness flying from Toronto to Kansas

---

[1]      The court notes the inapplicability to this case of the balance of equity factors regarding the availability of compulsory process and the cost of obtaining the attendance of witnesses.  Accordingly, the court's analysis set forth below does not address these factors.

City would travel an additional 500 miles than if the witness was flying to Washington, D.C. Because transferring venue from Virginia to Kansas would work more inconvenience on the plaintiffs' nonparty witnesses, the court's consideration of this factor advises for retaining venue in this district.

### b. Convenience of the parties and ease of access to sources of proof

With respect to the inquiries regarding convenience to the parties and ease of access to sources of proof, the court concludes that these factors likewise cut in favor of retaining venue in this district. The plaintiffs accurately maintain that the defendants "ha[ve] not shown that [their] documents and other proof are particularly bulky or difficult to transport, or that it is somehow a greater imposition" for the defendants "to bring [their] proof to" Virginia than for the plaintiffs to bring their proof to Kansas City. Stinnes Interoil, Inc. v. Apex Oil Co., 604 F. Supp. 978, 983 (S.D.N.Y. 1985); see also Mayer v. Dev. Corp. of Am., 396 F. Supp. 917, 935 n.29 (D. Del. 1975) (denying the defendants' motion to transfer venue and observing that the "defendants have failed to show that relevant documents now located in Florida could not be conveniently introduced at trial in Delaware"). In fact, the defendants conceded at the motions hearing that transporting discovery from Kansas to Virginia would not inconvenience the defendants. Hence, the court finds that party convenience and discovery concerns urge the court to retain jurisdiction in this district.

### c. Systematic integrity and fairness

This factor incorporates a broad array of considerations, only two of which are relevant to this case—docket conditions and the court's familiarity with the applicable law. Coors Brewing Co. v. Oak Beverage, Inc., 549 F. Supp. 2d 764, 773 (E.D. Va. 2008). First, with respect to docket conditions, the plaintiffs observe that, according to the most recent Federal Judicial

10

Caseload Statistics, this case will reach trial approximately seven months sooner in this district than it would in Kansas. (Docket No. 14, Ex. B). However, docket considerations do not carry dispositive weight in a court's analysis of whether to transfer a case. Finmeccanica S.p.A. v. Gen. Motors Corp., No. 1:07-cv-794, 2007 WL 4143074, at *8 (E.D. Va. Nov. 19, 2007).

Second, the court discerns no reason why it cannot adjudicate the Kansas law claims in this case. The plaintiffs' first cause of action emanates from KUTSA, a statute based on the Uniform Trade Secrets Act, which has been adopted in almost every state in the country, including Virginia. Va. Code Ann. § 59.1-336 (West 2011). The plaintiffs' remaining claims derive from settled, widely applicable legal principles, namely, breach of contract, breach of an implied-in-fact contract, and unjust enrichment. As such, the court harbors no reservations with respect to its capacity to adjudicate the plaintiffs' Kansas law claims. See, e.g., Reynolds Foil Inc. v. Pai, No. 3:09CV657, 2010 WL 1225620, at *9 (E.D. Va. Mar. 25, 2010) (denying the defendant's motion to transfer despite the fact that the court might be required to apply a foreign state's laws, and observing that "federal courts are regularly called upon to apply the law of other states"); Glamorgan Coal Corp. v. Ratners Group, PLC, 854 F. Supp. 436, 438 (W.D. Va. 1993) (granting the defendant's motion to transfer from Virginia to New York, and remarking that "there is no reason to suspect that a New York court will have difficulty interpreting Virginia securities law"); Hall v. Kittay, 396 F. Supp. 261, 265 (D. Del. 1975) (granting the defendants' motion to transfer from Delaware to New York, and stating that the "plaintiff's emphasis that this Court would have greater expertise in applying Delaware law to the pendent state law claims is exaggerated").

11

### d. Interests in having local controversies decided at home

The court recognizes that this case features controversies that bear some relation to Kansas. Not only is Kansas the defendants' home, but it is also the location where the parties entered into the Nondisclosure Agreement and convened several times to discuss the development of the Application. (Docket No. 14 at 7.) Furthermore, the parties agreed that Kansas law would govern the Nondisclosure Agreement. (<u>Id.</u> at 7-8.)

On the other hand, the court observes that, as discussed above, the defendants have acknowledged the propriety both of the court's exercise of personal jurisdiction over the defendants and of venue in this district. Furthermore, the plaintiffs allege that both defendants have caused tortious injury in Virginia, have regularly solicited business and derived substantial sales revenue in Virginia, and have committed breach of contract in Virginia. (Docket No. 1 at ¶¶ 4-5.) Hence, although Kansas may hold a greater interest in the resolution of this case within its borders, Virginia possesses at least some interest in this case's adjudication.

### e. Balance of factors

Based on the preceding analysis, the court concludes that the relevant factors weigh in favor of retaining venue in this district. In any event, to the extent that balancing the factors yields a close result, the court affords some deference to the plaintiffs' choice of venue.[2] Furthermore, the court notes that the defendants still shoulder the burden "to show that 'the

_____

[2] As explained above, a plaintiff's choice of forum ordinarily commands deference, <u>Doe v. Connors</u>, 796 F. Supp. 214, 221 (W.D. Va. 1992), and is a decision "not easily to be overthrown." <u>Akers v. Norfolk & W. Ry. Co.</u>, 378 F.2d 78, 80 (4th Cir. 1967). The plaintiffs in the instant case admittedly forfeit a portion of that deference due to the fact that Virginia is not their home forum. <u>Glamorgan Coal Corp. v. Ratners Group, PLC</u>, 854 F. Supp. 436, 437 (W.D. Va. 1993). Furthermore, the defendants contend that the plaintiffs surrender even more of that deference because little exists to connect this case with their chosen forum. <u>Id.</u> at 438. Even assuming that the defendants' argument has merit, the plaintiffs' choice of venue would carry only "less" weight than it otherwise would. <u>Id.</u> Thus, the court observes that the plaintiffs' choice of forum still demands at least some deference. <u>See Collins v. Straight, Inc.</u>, 748 F.2d 916, 922 (4th Cir. 1984) ("[A] district court is required to weigh the factors involved and '[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" (quoting <u>Gulf Oil v. Gilbert</u>, 330 U.S. 501, 508 (1946))).

balance of equities is in their favor [and] that judicial economy and convenience to all parties favor suit in another forum.'" Doe, 796 F. Supp. at 221 (quoting Eldridge v. Bouchard, 620 F. Supp. 678, 684 (W.D. Va. 1985)). As the foregoing analysis demonstrates, the defendants have failed to satisfy this burden—the defendants have failed to show that the balance of equities tilts in their favor and that judicial economy and convenience to all parties favor suit in Kansas. Accordingly, the court will deny the defendants' motion to transfer venue.

**B.     Motions to dismiss**

The court now considers the defendants' motions to dismiss the counts in the complaint for breach of an implied-in-fact contract and for unjust enrichment.

### 1.     Legal Standard

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; 'importantly, [the motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" McBurney v. Cuccinelli, 616 F.3d 393, 408 (4th Cir. 2010) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). Thus, the proper inquiry is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support [its] claim[s]." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

In contemplating a Rule 12(b)(6) motion, a court may "consider the complaint itself and any documents that are attached to it." CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009); see also Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."); Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991) (stating that the district court properly considered as part of the complaint a copy of a construction contract attached to the complaint). The court must accept all of the allegations in the complaint as true and draw all

13

reasonable inferences in favor of the plaintiff. <u>Edwards</u>, 178 F.3d at 244. Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). Assuming that the factual allegations in the complaint are true, they "must be enough to raise a right to relief above the speculative level." <u>Id.</u>

2. **Analysis**

For the reasons detailed below, the court will grant the defendants' motions to dismiss the implied-in-fact contract claim as to Beacon and will take under advisement the motions to dismiss the implied contract claim as to Beacon Europe. Additionally, the court will deny the defendants' motions to dismiss the unjust enrichment claim.

a. **Implied-in-fact contract claim**

The plaintiffs, in Count III of the complaint, state against the defendants a claim for breach of an implied-in-fact contract. The defendants have moved the court under Rule 12(b)(6) to dismiss this claim. The defendants argue that the court must dismiss the implied contract claim as to Garmin International on the ground that Kansas law precludes a claim for breach of an implied-in-fact contract when an express contract governs the disputed issue, and on the ground that Beacon's assertion of ownership in the defendants' software requires a writing. (Docket No. 16.) The defendants further argue that the court must dismiss the implied contract claim as to Garmin USA on the ground that the plaintiffs allege insufficient facts regarding Garmin USA. (Docket No. 18.)

14

**(1)    Garmin International**

Garmin International contends that Kansas law precludes a cause of action for breach of an implied contract "when an enforceable express contract regulates the relations of the parties with respect to the disputed issue." Ice Corp. v. Hamilton Sundstrand Inc., 444 F. Supp. 2d 1165, 1170 (D. Kan. 2006); see also Zwygart v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Kan., 483 F.3d 1086, 1094 (10th Cir. 2007) ("It has long been Kansas law that 'the existence of an express agreement precludes the idea of the existence of an implied one.'" (quoting Ericson v. Charles, 194 P. 652, 653 (Kan. 1921))).  As such, the defendants argue that the plaintiffs' express contract claim, based on the alleged breach of the Nondisclosure Agreement, precludes the plaintiffs' alternative claim for breach of an implied-in-fact contract because the implied contract claim emanates from the same facts and circumstances from which the express contract claim arises.  The plaintiffs counter by arguing that an "accurate reading of the entire Complaint clearly shows that the alleged implied-in-fact contract is very different to, and far more extensive than, the [Nondisclosure Agreement]." (Docket No. 23 at 9.)  According to the plaintiffs, the implied-in-fact contract claim embraces far more conduct than the alleged use and disclosure by the defendants of the Application, including the defendants' alleged promises of compensation and the plaintiffs' uncompensated provision of resources, development costs, and related services. (Id. at 9-11.)

The express contract at issue, the Nondisclosure Agreement, imposes upon Beacon and Garmin International the following obligations:

> Each party agrees that it will not at any time or in any manner use any of the other party's Confidential Information for any purpose except for the limited purpose of evaluating a possible business relationship with the other party . . . .  Each party agrees that[]it will not disclose any of the Confidential Information to any person or entity without the prior written consent of [either party].

Case 5:11-cv-00025-GEC-BWC   Document 38   Filed 10/05/11   Page 15 of 24   Pageid#: 291

(Docket No. 1-1 at 2.)  In their complaint, the plaintiffs allege that the defendants "intentionally and willfully breached the Non[d]isclosure Agreement by making the Application, together with information and specifications relating thereto, publicly available and accessible to third parties." (Docket No. 1 at ¶¶ 39-40.)

The plaintiffs structure their implied contract claim in almost identical language.  Under the heading of Count III in the complaint, the plaintiffs allege that the parties' course of dealing and the surrounding circumstances gave rise to "an implied-in-fact contract by and among the Plaintiffs and the Defendants that the Defendants would not use or disclose the Application and information and specifications relating thereto without the Plaintiffs' consent."[3]  (Docket No. 1 at ¶ 46.)  In the next paragraph, the plaintiffs allege that the defendants "intentionally and willfully breached the parties' implied-in-fact contract by making the Application, together with information and specifications relating thereto, publicly available and accessible to the third parties."  (Id. at ¶ 47.)  Additionally, the plaintiffs allege in the body of the complaint, though not under the heading of Count III, facts regarding the defendants' alleged promises of compensation and the plaintiffs' uncompensated provision of resources, development costs, and related services.  (Docket No. 1 at ¶¶ 17-22.)  The plaintiffs contend that these factual allegations stretch the scope of the implied contract claim beyond the mere use and disclosure by the defendants of the Application, which forms the basis of the express contract claim.  (Docket No. 23 at 9-11.)

Despite these additional allegations regarding the defendants' promises of compensation and the plaintiffs' uncompensated provision of services, the court nonetheless finds that the plaintiffs' implied contract claim emanates from the same facts and circumstances that give rise

---

[3]  Earlier in the complaint, the plaintiffs provide more factual detail with respect to the specific course of dealing and surrounding circumstances to which the plaintiffs refer in paragraph 46 of the complaint.  (Docket No. 1 at ¶¶ 15-22.)

16

to their express contract claim.[4] The Nondisclosure Agreement contemplated the formation of "a possible business relationship" between the parties—an agreement to agree. (Docket No. 1-1 at 2.) The additional conduct that the plaintiffs argue exceeded the scope of the express contract and formed the basis of the implied contract (the promises of compensation and the provision of services and resources) flowed from the parties' efforts to work toward a solid business relationship or, in other words, flowed from the "agreement to agree" provision in the Nondisclosure Agreement. Kansas law frowns upon agreements to agree. Indep. Drug Wholesalers Group, Inc. v. Denton, 833 F. Supp. 1507, 1524 (D. Kan. 1993) (observing that agreements to agree are unenforceable due to courts' inability to supply the terms of an actual agreement that the parties intend to reach in the future); Mohr v. State Bank of Stanley, 770 P.2d 466, 479-80 (Kan. 1989) (determining that a purported contract bore no evidence of a meeting of the minds and lacked essential terms and, thus, was nothing more than an unenforceable agreement to agree); see also Space Tech. Dev. Corp. v. Boeing Co., 209 F. App'x 236, 240 (4th Cir. 2006) ("[A]n 'agreement to agree' . . . is unenforceable under Virginia law." (citing Beazer Homes Corp. v. VMIF/Anden Southbridge Venture, 235 F. Supp. 2d 485, 488, 489 (E.D. Va. 2002))). Hence, the plaintiffs' implied contract claim fails not only because the "express contract regulates the relations of the parties with respect to the disputed issue," Ice Corp., 444 F. Supp. 2d at 1170, but also because the express contractual provision upon which the plaintiffs base their implied contract claim is one that the law considers unenforceable.

The plaintiffs argue that the court should not dismiss the implied contract claim due to the inequity that would result. (Docket No. 23 at 12-13.) In their answer to the complaint, the

---

[4] In the court's view of the case, any damage that accrued based on the alleged breach of the express contract is exactly the same damage that accrued based on the alleged breach of the implied contract, namely, the consequential damages occasioned by the violation of the Nondisclosure Agreement through the alleged disclosure of the plaintiffs' proprietary information. Thus, under both of these contract theories, the measure of damage is different from that allegedly sustained under the unjust enrichment claim, as discussed infra.

17

defendants advance several affirmative defenses which, if successful, will defeat the plaintiffs' claim for breach of the Nondisclosure Agreement.[5] The plaintiffs contend that, if the court dismisses the plaintiffs' implied contract claim, they will be left with no remedy for the alleged disclosure of the Application if the Nondisclosure Agreement later proves invalid or unenforceable per the defendants' affirmative defenses.[6] However, this argument is misplaced because, should the defendants' defenses prove successful as to the plaintiffs' express contract claim, the defenses would simultaneously defeat the implied contract claim.[7]

The plaintiffs also argue that Kansas law does not preclude an implied contract claim by Beacon Europe because Beacon Europe was not a party to the Nondisclosure Agreement and, therefore, because the express contract does not regulate Beacon Europe's interactions with the defendants. (Docket No. 23 at 9.) To bolster this contention, the plaintiffs refer to the Nondisclosure Agreement itself, which constitutes an agreement executed only by Beacon and Garmin International. (Docket No. 1-1.) Furthermore, the plaintiffs reference Count II of the complaint—the claim, brought solely by Beacon against Garmin International, regarding the

---

[5]    Specifically, the defendants assert as affirmative defenses to the breach of contract claim the following theories: failure of consideration, failure to perform a condition precedent, statute of limitations, and failure to mitigate damages and to plead recoverable damages. (Docket No. 19 at 8.)

[6]    The plaintiffs are correct that Kansas law anticipates the possibility of such an inequitable result. Despite Kansas law's general rule that an express contract precludes concomitant claims for breach of an implied contract or for unjust enrichment, Kansas law recognizes that "[t]hese theories, which include unjust enrichment and implied contract may, however, be available if the contract is void, unenforceable, rescinded, or waived by the party seeking to recover." Ice Corp., 444 F. Supp. 2d at 1170-71 (footnote omitted); see also Fed. R. Civ. P. 8(a) ("A pleading that states a claim for relief must contain . . . a demand for the relief sought, which may include relief in the alternative or different types of relief."); Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defenses alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").

[7]    A defense that defeats an express contract will also defeat an implied-in-fact contract because, to prove the existence of an implied-in-fact contract, a plaintiff essentially must prove the same elements that comprise an express contract. Under Kansas law, an implied-in-fact contract "is one 'inferred from the facts and circumstances of the case' but which is 'not formally or explicitly stated in words.'" Smith v. Amoco Prod. Co., 31 P.3d 255, 265 (Kan. 2001) (quoting Atchison Cnty. Farmers Union Co-op Ass'n v. Turnbull, 736 P.2d 917, 922 (Kan. 1987)). "Thus, an implied-in-fact contract is a true contract arising from mutual agreement and intent to promise, but where the agreement and promise have not been verbally expressed." Scott v. Raudin McCormick, Inc., No. 08-4045, 2009 WL 3561301, at *14 (D. Kan. Oct. 30, 2009) (citing In re Penn Cent. Transp. Co., 831 F.2d 1221, 1228 (3d Cir. 1987)); see also Smith, 31 P.3d at 265 (stating that an implied-in-fact contract "is the product of agreement, although it is not expressed in words" (citation omitted)).

breach of the Nondisclosure Agreement—to demonstrate yet further that the Nondisclosure Agreement does not regulate Beacon Europe's interactions with the defendants. (Docket No. 1 at 9.) At the motions hearing, the defendants took exception to the plaintiffs' position, emphasizing that the Nondisclosure Agreement encompasses Beacon Europe through a clause that permits either Beacon or Garmin International to "involve one or more of [their] Affiliates in the disclosure or receipt of Confidential Information."[8] (Docket No. 1-1 at 3.)

The plaintiffs' argument has merit—if Beacon Europe is not a party to the Nondisclosure Agreement, then no express agreement exists to preclude Beacon Europe's implied contract claim against the defendants. Ice Corp., 444 F. Supp. 2d at 1171 (noting that, if an express contract did not exist, the plaintiff's implied contract claim would not be precluded); see also Zwygart, 483 F.3d at 1094 ("It has long been Kansas law that 'the existence of an express agreement precludes the idea of the existence of an implied one.'" (citation omitted)). The determination of whether Beacon Europe is a party to the Nondisclosure Agreement requires an interpretation of the affiliates clause and of the contract as a whole. "As a general rule, the interpretation or construction and meaning and legal effect of written instruments are matters of law exclusively for the court and not questions of fact for determination by the jury." Spivey v. Safeco Ins. Co., 865 P.2d 182, 185 (Kan. 1993) (citing Fed. Land Bank of Wichita v. Krug, 856 P.2d 111, 114 (Kan. 1993)). However, the interpretation of a written contract that is ambiguous presents a question of fact. See Gore v. Beren, 867 P.2d 330, 337 (Kan. 1994) ("The interpretation of a written contract that is free from ambiguity is a judicial function and does not require oral testimony to determine the contract's meaning. An ambiguity in a contract does not

---

[8] This specific clause in the Nondisclosure Agreement also provides that "[e]ach party is responsible for its Affiliates' compliance with all of the terms of th[e Nondisclosure Agreement]" and that "Confidential Information received from or disclosed to an Affiliate of a party must be treated the same as Confidential Information received from or disclosed to a party." (Docket No. 1-1 at 3.)

19

appear until two or more meanings can be construed from the contract provisions." (citation and internal quotation marks omitted)); see also 11 Richard A. Lord, Williston on Contracts § 30:7 (4th ed. 2011) ("Where a written contract is ambiguous, a factual question is presented as to the meaning of its provisions, requiring a factual determination as to the intent of parties in entering the contract. Thus, the fact finder must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning." (footnotes omitted)).

The court concludes that the Nondisclosure Agreement is ambiguous on the issue whether Beacon Europe is a party to the Nondisclosure Agreement.[9] On the first page, the Nondisclosure Agreement provides that only Garmin International and Beacon are parties to the contract. (Docket No. 1-1 at 1.) The affiliates clause referenced by the defendants injects ambiguity into the agreement regarding Beacon Europe's status. This clause renders the Nondisclosure Agreement susceptible to two competing interpretations—on the one hand, that only Beacon and Garmin International are parties to the contract and, on the other hand, that affiliates which receive confidential information are swept into the ambit of the contract and therefore become parties to the contract. See Gore, 867 P.2d at 337 ("To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning." (citation and internal quotation marks omitted)). Hence, because the Nondisclosure Agreement presents an ambiguity on the issue whether Beacon Europe is a party to the contract, the interpretation of the contract on this issue constitutes a question of fact that is inappropriate for resolution on this

---

[9] Whether a contract is ambiguous constitutes a question of law. Gore, 867 P.2d at 337.

20

Rule 12(b)(6) motion to dismiss. <u>Gore</u>, 867 P.2d at 337; 11 Lord, <u>supra</u>, § 30:7; <u>see also, e.g.</u>, <u>Record Data Int'l, Inc. v. Nichols</u>, 381 So. 2d 1, 7 (Ala. 1979) (finding that the trial court did not err in submitting to the jury the issue of who were the parties to an agreement, instead of deciding the issue as a matter of law).

Garmin International also argues for dismissal of the implied contract claim on the basis that Beacon's assertion of ownership in the defendants' software requires a writing. (Docket No. 16 at 6-7.) Essentially, the defendants argue that, because the plaintiffs insist that the defendants could not disclose the Application's specifications without the plaintiffs' consent, the plaintiffs claim an exclusive right or license in the Application. (Docket No. 32 at 6.) To hold an exclusive license, a party must produce a signed writing evidencing the transfer of ownership. <u>Lyrick Studios, Inc. v. Big Idea Prods., Inc.</u>, 420 F.3d 388, 391-92 (5th Cir. 2005). Because the plaintiffs produce no signed writing, the defendants argue that the plaintiffs possess no basis on which to assert an exclusive license in the Application. However, the defendants' argument must fail. The Nondisclosure Agreement itself imposes upon the parties the obligation to seek the other's "prior written consent" before disclosing any of the other party's confidential information. (Docket No. 1-1 at ¶ 2.) Hence, the plaintiffs' insistence that the defendants should have sought approval before allegedly disclosing the Application stems not from a license-based claim of exclusive ownership, but from a well-founded endeavor to enforce contractual provisions to which both parties agreed.

Hence, for the reasons detailed above, the court will take under advisement Garmin International's motion to dismiss the implied contract claim as to Beacon Europe, pending development of the record. On the other hand, the court will grant Garmin International's motion to dismiss the implied contract claim as to Beacon.

### (2)     Garmin USA

Garmin USA argues that the court must dismiss the implied contract claim on the ground that the plaintiffs allege insufficient facts regarding Garmin USA. Initially, the court notes that, because Beacon has failed to state an implied contract claim against Garmin International, it has also failed to state such a claim against Garmin USA. To the extent that Beacon Europe may state an implied contract claim against Garmin USA, the court will take under advisement Garmin USA's motion to dismiss this claim, pending development of the record regarding Garmin USA's relationship to Garmin International.

### b.     Unjust enrichment claim

The plaintiffs, in Count IV of the complaint, state against the defendants a claim for unjust enrichment. The defendants have moved the court under Rule 12(b)(6) to dismiss this claim. The defendants argue that the court must dismiss the unjust enrichment claim as to Garmin International on the grounds that Kansas law precludes a claim for unjust enrichment when an express contract governs the disputed issue, that Beacon's assertion of ownership in the defendants' software requires a writing,[10] and that KUTSA preempts the claim for unjust enrichment. (Docket No. 16.) The defendants further argue that the court must dismiss the unjust enrichment claim as to Garmin USA on the grounds that the plaintiffs allege insufficient facts regarding Garmin USA and that KUTSA preempts the claim for unjust enrichment. (Docket No. 18.)

Similar to the law discussed above with respect to implied contract claims, Kansas law likewise provides that the assertion of an express contract claim precludes the simultaneous assertion of an unjust enrichment claim "when an enforceable express contract regulates the

---

[10] The court dispenses with the exclusive license argument for the same reasons that it rejected this contention in its discussion, supra, of Garmin International's motion to dismiss the implied contract claim.

relations of the parties with respect to the disputed issue." <u>Ice Corp.</u>, 444 F. Supp. 2d at 1170; <u>see also</u> <u>Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Sapulpa</u>, 130 F.3d 950, 957 (10th Cir. 1997) (stating that an express agreement precludes the existence of an unjust enrichment claim under Kansas law). The court concludes that, unlike the plaintiffs' implied contract claim, the plaintiffs have pled sufficient facts in their complaint to suggest that the unjust enrichment claim could emanate from broader facts and circumstances than the facts and circumstances that give rise to the express contract claim. The plaintiffs' unjust enrichment claim includes the allegation that the defendants appropriated the Application and integrated it into a commercial product which the defendants then sold. (Docket No. 1 at ¶ 52.) Hence, when viewed in a light most favorable to the plaintiffs, the unjust enrichment claim exceeds the scope of the Nondisclosure Agreement, which makes no provision for the sale of products incorporating the Application and provides no remedy for such conduct. As such, the Nondisclosure Agreement arguably does not "regulate[] the relations of the parties with respect to the disputed issue." <u>Ice Corp.</u>, 444 F. Supp. 2d at 1170.

Both defendants also move the court to dismiss the unjust enrichment claim because KUTSA, under which the plaintiffs bring Count I of their complaint, "displaces conflicting tort, restitutionary and other law of this state providing civil remedies for misappropriation of a trade secret," provided that the "civil remedies are not based upon misappropriation of a trade secret." Kan. Stat. Ann. § 60-3326 (West 2010). The defendants contend that, because the plaintiffs' unjust enrichment claim flows entirely from the defendants' alleged misuse and disclosure of the plaintiffs' trade secrets, KUTSA precludes this claim. (Docket No. 16 at 8.) As discussed above, when viewed in a light most favorable to the plaintiffs, the unjust enrichment claim encompasses more conduct than the mere use and disclosure of confidential information in that

23

the unjust enrichment claim contemplates the allegation that the defendants appropriated the Application and integrated it into a commercial product which the defendants then sold.

Accordingly, the court denies Garmin International's motion to dismiss the unjust enrichment claim. These same reasons justify the court's denial of Garmin USA's motion to dismiss the unjust enrichment claim, regardless of Garmin USA's relationship with Garmin International.[11]

## Conclusion

For the reasons detailed above, the court will deny the defendants' motion to transfer venue to the District of Kansas. The court will grant Garmin International's motion to dismiss the plaintiffs' claim for breach of an implied-in-fact contract, Count III of the complaint, as to Beacon, and will take under advisement Garmin International's motion to dismiss Count III as to Beacon Europe. Likewise, the court will grant Garmin USA's motion to dismiss Count III as to Beacon, and will take under advisement Garmin USA's motion to dismiss Count III as to Beacon Europe. The court also will deny the defendants' motions to dismiss the plaintiffs' claim for unjust enrichment, Count IV of the complaint.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

**ENTER**: This _5th_ day of October, 2011.

_[signature]_

_____
Chief United States District Judge

---

[11]    Of course, the court's instant ruling on the unjust enrichment claim pertains only to the defendants' motions to dismiss. After factual development, the viability of the unjust enrichment claim may be the focus of a subsequent motion for summary judgment.

Case 5:11-cv-00025-GEC-BWC   Document 38   Filed 10/05/11   Page 24 of 24   Pageid#: 300