CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
MAY 09 2012
JULIA C. DUDLEY, CLERK
BY: /s/ Deputy Clerk
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| BEACON WIRELESS SOLUTIONS, INC., et al., | Civil Action No. 5:11-cv-00025 |
| Plaintiffs, | |
| | **MEMORANDUM OPINION** |
| v. | |
| | By: Hon. Glen E. Conrad |
| GARMIN INTERNATIONAL, INC., et al., | Chief United States District Judge |
| Defendants. | |

This case is presently before the court on the defendants' motion for summary judgment. For the reasons set forth below, the court will grant in part and deny in part the defendants' motion.

I. **Factual and Procedural Background**

Beacon Wireless Solutions, Inc. ("Beacon") and Beacon Wireless Europe (UK) Limited ("Beacon Europe") (collectively, "plaintiffs") initiated this civil action on March 21, 2011 against Garmin International, Inc. ("Garmin International") and Garmin USA, Inc. ("Garmin USA") (collectively, "defendants"). This case stems from a business relationship gone bad between two technology companies that initially collaborated to design and market an application that would integrate Beacon's Global Positioning System vehicle tracking program into Garmin International's personal navigation devices ("PND"). Essentially, the plaintiffs claim that the defendants, based on initial representations of compensation, tapped into the plaintiffs' specialized knowledge of the fleet management industry and their extensive fleet management system platform to develop an application that would allow the defendants to integrate their PNDs with the plaintiffs' vehicle tracking program and then, unbeknownst to the plaintiffs, made the application specifications public so that the defendants could boost PND

sales by allowing the plaintiffs' competitors to integrate their vehicle tracking programs into the defendants' PNDs as well. More specifically, the plaintiffs claim that the defendants misappropriated the plaintiffs' trade secrets and breached a nondisclosure agreement ("Nondisclosure Agreement") executed by both parties that prohibited either party from disclosing the other party's proprietary information or from utilizing such information for any purpose unrelated to the parties' business relationship. Furthermore, the plaintiffs assert that, by making public the plaintiffs' proprietary information regarding the application, the defendants triggered the collapse of the application's market value to the plaintiffs. The plaintiffs also claim that the defendants utilized the plaintiffs' proprietary fleet management system platform and other trade secrets in a manner not contemplated by the nondisclosure agreement. Furthermore, according to the plaintiffs, the defendants were unjustly enriched through the plaintiffs' uncompensated provision of valuable services and resources from which the defendants benefited by selling PNDs incorporating the application. The plaintiffs initiated this lawsuit, bringing claims against the defendants for misappropriation of trade secrets, breach of contract, breach of an implied-in-fact contract, and unjust enrichment. (Docket No. 1.)

The defendants previously moved the court to transfer venue and to dismiss the implied contract and unjust enrichment claims. On October 5, 2011, the court issued a memorandum opinion on the defendants' motions. (Docket No. 38.) The court denied the motion to transfer venue, but granted in part and denied in part the motion to dismiss. The court granted the motion to dismiss with respect to Beacon's implied-in-fact contract claim, determining that the plaintiffs' implied contract claim emanated from the same facts and circumstances that gave rise to their express contract claim. More specifically, the court concluded that the conduct which, according to the plaintiffs, exceeded the scope of the Nondisclosure Agreement and formed the

2

basis for the implied contract claim (the promises of compensation and the provision of services and resources) flowed from the Nondisclosure Agreement's unenforceable "agreement to agree" provision. However, although the court dismissed Beacon's implied contract claim, the court took under advisement the motion to dismiss as to Beacon Europe's implied contract claim, determining that the Nondisclosure Agreement was ambiguous with respect to whether Beacon Europe was a party to the contract.

Furthermore, the court denied the motion to dismiss with respect to both plaintiffs' unjust enrichment claims, determining that the unjust enrichment claim arguably emanated from a broader set of facts than the circumstances that gave rise to the express contract claim. More specifically, the court determined that the unjust enrichment claim could encompass more conduct than the mere use and disclosure of confidential information (the conduct embraced by the express contract claim) in that the unjust enrichment claim arguably contemplated the allegation that the defendants appropriated the application and integrated it into a commercial product which the defendants then sold.

Thereafter, on April 12, 2012, the defendants filed a sealed motion for summary judgment, arguing that no genuine issue of material fact exists as to any of the plaintiffs' four claims. (Docket No. 86.) The plaintiffs filed their sealed brief in opposition on April 25, 2012, contending that the existence of genuine issues of material fact precludes entry of summary judgment in favor of the defendants. (Docket No. 111.) The defendants filed their reply brief on May 2, 2012. (Docket No. 125.) The court heard argument on the motion on May 4, 2012.

## II. Discussion

### A. Standard of review

In considering a motion for summary judgment under Federal Rule of Civil Procedure 56, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). The court may grant summary judgment only when, viewing the record as a whole and in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the nonmoving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985). For a party's evidence to raise a genuine issue of material fact that avoids summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### B. Analysis

#### 1. Trade secrets claim

As stated above, the plaintiffs assert a claim against the defendants under the Kansas Uniform Trade Secrets Act ("KUTSA"), arguing that the defendants misappropriated their trade secrets. To establish that information qualifies as a trade secret under Kansas law, a plaintiff must show that the information (1) has independent economic value; (2) derives its value from not being generally known or readily ascertainable; and (3) has its secrecy maintained by reasonable efforts. Dodson Int'l Parts, Inc. v. Altendorf, 347 F. Supp. 2d 997, 1010 (D. Kan. 2004); see also KUTSA, Kan. Stat. Ann. § 60-3320(4) (2011).

The defendants assert that the plaintiffs' purported trade secrets distill into two separate categories: (1) various features of Beacon's fleet management system that, through the

4

integration application, are displayed on the screen of a Garmin PND, and (2) testing support provided to the defendants through the plaintiffs' fleet management system platform.[1] The defendants contend that the evidence in the record indicates that these alleged trade secrets do not, in reality, qualify as such under Kansas law. First, according to the defendants, the design features fail to qualify as trade secrets because they are not kept secret, but instead, are displayed to the plaintiffs' customers. Agency Solutions.Com, LLC v. Trizetto Group, Inc., 819 F. Supp. 2d 1001, 1028 (E.D. Cal. 2011). Furthermore, the defendants contend, the features derive no independent value from being kept secret, but only from public use, and they are not the subject of reasonable measures of secrecy by the plaintiffs. KUTSA § 60-3320(4); Progressive Prods., Inc. v. Swartz, 258 P.3d 969, 978 (Kan. 2011). The defendants also argue that KUTSA's three-year statute of limitations bars an action by the plaintiffs with respect to eight of the twelve features. KUTSA § 60-3325.

Second, the defendants categorize the plaintiffs' purported testing trade secrets as nothing more than problem-solving support and the hardware constituting the plaintiffs' communication box. As Garmin was developing both the interface specifications for the integration application and the software to reside on its PNDs, it utilized the plaintiffs' communications box and collaborated with the plaintiffs to debug glitches in the application and software. According to the defendants, this testing support fails to qualify as a trade secret because the support has no independent economic value and is not kept secret by the plaintiffs. More specifically, the defendants argue that they utilized the plaintiffs' hardware (the communication box) in the same manner as do the plaintiffs' customers. Furthermore, while the defendants do not contest that the

---

[1] Initially, the defendants also asserted that the plaintiffs' purported trade secrets contemplated a third category involving various foreign language translations that, similar to the features, are displayed on the screen of a Garmin PND. However, in their responsive brief, the plaintiffs do not categorize the foreign language translations as trade secrets, but instead, refer to them merely as "ancillary services." (Docket No. 111 at 21.)

5

technical details of the plaintiffs' fleet management system (e.g., the underlying source code, algorithms, protocols, or formats) qualify as trade secrets, it is undisputed that the defendants were not afforded access to these technical details. Silvaco Data Sys. v. Intel Corp., 109 Cal. Rptr. 3d 27, 34 (Cal. Ct. App. 2010), <u>overruled on other grounds by</u> Kwikset Data Sys. v. Intel Corp., 246 P.3d 877 (Cal. 2011) ("One does not, by executing machine-readable software, 'use' the underlying source code; nor does one acquire the requisite knowledge of any trade secrets embodied in that code.").

In response, the plaintiffs contend that their trade secrets distill into three separate categories: (1) the <u>combination</u> of the twelve design features; (2) the source code and other technical details of the software resident in the plaintiffs' fleet management system platform and in the telematics box; and (3) very specific technical information provided by the plaintiffs to the defendants for the purpose of assisting the defendants to engineer the PND software and the interface specifications. With respect to the combination of design features, the plaintiffs contend essentially that the visibility to customers of individual features does not vitiate the trade secret status of the combination of those features because, as the evidence suggests, the combination was not "readily ascertainable"—in other words, the combination was not easily duplicated on a PND by others in the small to medium-sized commercial fleet market until the defendants published the interface specifications, made available their PND software, and sold cables that enable a fleet management system to communicate with a Garmin PND.

With respect to the underlying source code and other technical details of the plaintiffs' software, the plaintiffs argue that the defendants misappropriated these trade secrets by testing the product with the ultimate purpose of making it available to all of the plaintiffs' competitors. With respect to the technical information provided by the plaintiffs to the defendants during the

6

engineering stage, the plaintiffs contend that this transfer of technical information constituted much more than mere commonplace problem-solving support. The specific information furnished solely to the defendants was not generally known in the industry and derived its independent economic value from not being generally known.

After reviewing the parties' briefs, hearing argument on the issue, and assessing the evidence in the record, the court concludes that the existence of genuine issues of material fact preclude the court from granting the motion for summary judgment with respect to the misappropriation of trade secrets claim. More specifically, the court determines that a genuine issue of material fact exists as to whether the plaintiffs have trade secrets under Kansas law in the combination of the twelve design features and in the technical information provided to the defendants in the development of the interface specifications. However, because the court believes that the defendants did not misappropriate the trade secrets comprised in the source code and other technical details of the plaintiffs' software, the court will grant the defendants' motion for summary judgment as to this aspect of the plaintiffs' KUTSA claim.

Kansas law recognizes that, even though individual features of a broader feature combination might exist in the market, the combination of those features nonetheless may qualify as a trade secret provided that the combination itself satisfies the requirements of the trade secret statute. See Koch Hydrocarbon Co., Div. of Koch Indus., Inc. v. Anderson, No. 90-1292-K, 1992 WL 79046, at *2–3 (D. Kan. 1992) (concluding that, although a certain customer list was compiled using public information, a genuine issue of material fact nonetheless existed as to whether the list qualified as a trade secret depending on "the amount of time and expense it would take for others to duplicate the information"); Andrew Corp. v. Van Doren Indus., Inc., CIV. A. No. 88-2414-O, 1990 WL 136779, at *4 n.3 (D. Kan. July 5, 1990) (determining that,

7

even if "individual features" of a design were "generally known," the plaintiff corporation's "exact combination of features could be characterized as a unique solution to the needs of its customer base and thus qualify as a 'trade secret'"); Mann v. Tatge Chem. Co., 440 P.2d 640, 647 (Kan. 1968) ("A trade secret can exist in a combination of components, each of which, by itself, might be in the public domain. A knowledge of the best combination of processes or systems of combination of elements may amount to a trade secret.").

The plaintiffs in the instant case point to evidence in the record suggesting that the precise combination of features offered by their product was not, in the words of the statute, "readily ascertainable," or easily replicable, in a Garmin PND in the sector of the fleet management industry served by the plaintiffs before the defendants published the interface specifications, made available their PND software, and sold connecting cables. Koch Hydrocarbon Co., Div. of Koch Indus., Inc., 1992 WL 79046, at *2–3. Evidence in the record also suggests that this combination of features derived independent economic value from not being readily ascertainable and was the subject of reasonable efforts of secrecy. See All W. Pet Supply Co. v. Hill's Pet Prods. Div., Colgate-Palmolive Co., 840 F. Supp. 1433, 1438 (D. Kan. 1993) ("[W]hether the possessor of such information has taken reasonable steps to protect its secrecy is also a question of fact . . . . [O]nly reasonable efforts are required to protect the secrecy of putative trade secrets, not all conceivable efforts . . . ."). Therefore, the court concludes that a genuine issue of material fact exists as to whether the plaintiffs' combination of twelve design features constitutes a trade secret under Kansas law. See Universal Engraving, Inc. v. Duarte, 519 F. Supp. 2d 1140, 1151 (D. Kan. 2007) ("The existence of a trade secret is an issue for the trier of fact."); All W. Pet Supply Co., 840 F. Supp. at 1437 ("The existence of a

trade secret under the Uniform Trade Secrets Act is a question of fact for determination by the trier of fact.").

Furthermore, another genuine issue of material fact exists as to whether the specific technical information that the plaintiffs transmitted to the defendants (to allow the defendants to acquire the twelve design features on their PNDs) falls within the ambit of a trade secret under KUTSA. Universal Engraving, Inc., 519 F. Supp. 2d at 1151; All W. Pet Supply Co., 840 F. Supp. at 1437. Evidence in the record suggests that this information was not generally known, was the subject of reasonable measures of secrecy by the plaintiffs, and derived independent economic value based on its elusiveness in the market. For these reasons, the court will deny the motion for summary judgment as to the KUTSA claim relating to the plaintiffs' combination of design features and technical information provided to the defendants.[2]

On the other hand, as explained above, the court will grant the motion as to the KUTSA claim as it relates to the source code and other technical details of the plaintiffs' software. As stated above, there is no dispute that the plaintiffs did not afford the defendants access to these technical details. For this reason, the court believes that the defendants did not use or otherwise

---

[2] In so ruling, the court rejects the defendants' argument that KUTSA's three-year statute of limitations bars an action by the plaintiffs with respect to eight of the twelve design features. According to the defendants, the plaintiffs knew or reasonably should have known that the defendants' first act of alleged misappropriation of eight of the features occurred more than three years before the instant suit was filed on March 21, 2011. See KUTSA § 60-3325 ("An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."). Initially, the court notes that, to the extent that the defendants assert that the statute of limitations began to run when the parties made various public demonstrations or disclosures of the features themselves from 2006 to 2008, this argument fails because, as discussed above, mere public disclosure of the features themselves did not necessarily destroy trade secret status if duplication still remained difficult. The defendants also base their statute of limitations argument on their assertion that, in February 2007, the defendants published an early version of the application specifications for five of the twelve design features. Furthermore, the defendants point to evidence in the record suggesting that the plaintiffs were aware of this public disclosure from February 2007 to March 2008. However, this argument likewise must fail. The plaintiffs point to evidence in the record indicating that the defendants themselves were unsure of when, exactly, the specifications were published. In any event, the court finds most convincing the plaintiffs' argument that the mere publication of the interface specifications, by itself, would not render the features readily ascertainable without the simultaneous availability of the PND software and connecting cables. After all, it was the combination of the design features that constitutes the plaintiffs' purported trade secrets. In short, the court determines that the defendants have failed to carry their burden of persuasion on this statute of limitations argument.

Case 5:11-cv-00025-GEC-BWC Document 142 Filed 05/09/12 Page 9 of 17 Pageid#: 2956

misappropriate these technical details when they utilized the plaintiffs' telematics hardware to test and develop the interface specifications and the software resident on the PNDs. See KUTSA § 60-3320(2) (providing that "misappropriation" means either "acquisition" or "disclosure or use" of a trade secret); see also Silvaco, 109 Cal. Rptr. 3d at 34 ("One does not, by executing machine-readable software, 'use' the underlying source code; nor does one acquire the requisite knowledge of any trade secrets embodied in that code."). Therefore, the court will grant the motion for summary judgment with respect to the KUTSA claim as it relates to the plaintiffs' source code and other technical details resident in their software.

### 2. Breach of contract claim

As stated above, the plaintiffs bring a breach of contract action against the defendants, contending that the defendants breached the Nondisclosure Agreement by disclosing the plaintiffs' confidential information, as that term is defined in the contract, to third parties, and by otherwise using such information in a manner not contemplated by the contract. The defendants assert that no genuine issue of material fact exists with respect to the breach of contract claim because none of the information that they disclosed or used fell within the ambit of the Nondisclosure Agreement.

Clause 1 of the Nondisclosure Agreement provides:

> "Confidential information" as used in this Agreement shall include, but is not limited to, all trade secrets, non-public information, data, know-how, documentation, hardware, software (including listings thereof and documentation related thereto), diagrams, drawings and specifications relating to a party, its business or products which is marked as "confidential" or "proprietary" and which is disclosed by either party to the other party. Information disclosed orally or visually shall be considered Confidential Information if such information is identified as "confidential" or "proprietary" at the time of disclosure and is reduced to written summary form by the disclosing party and sent to the receiving party within thirty (30) days after initial disclosure. During this thirty (30) day period, such oral or visual information so disclosed shall be provided the same protection as Confidential Information.

10

(Docket No. 1-1 at 1.)

According to the defendants, the plaintiffs failed to mark as confidential or proprietary any of the documents or other information that they provided to the defendants in the course of their business relationship. As such, the defendants argue, that information is not swept within the contract's reach. However, the plaintiffs argue that the "shall include, but is not limited to" language of the contract injects ambiguity into the contract and renders it amenable to the interpretation that "Confidential Information" is not limited only to information labeled as such. Additionally, the plaintiffs contend that the subsequent conduct of both parties in habitually exchanging information without marking as confidential or proprietary amended the Nondisclosure Agreement. The defendants assert that the plaintiffs' "course of dealings" argument must fail based upon the Nondisclosure Agreement's requirement that all amendments to the contract must be in writing.

"Under Kansas law, the issue of whether a contract is ambiguous is a question of law to be determined by the court." Integrated Living Cmtys., Inc. v. Homestead Co., 106 F. Supp. 2d 1141, 1143 (D. Kan. 2000) (citing Clark v. Prudential Ins. Co. of Am., 464 P.2d 253, 256 (Kan. 1970)). As stated in open court during the motion hearing, the court concludes that clause 1 of the Nondisclosure Agreement is not ambiguous, but instead, clearly requires that information be marked as confidential or proprietary to qualify as "Confidential Information" within the meaning of the contract. However, this legal conclusion does not end the analysis. See Schafer v. All Things Exterior, Inc., 166 P.3d 450, 2007 WL 2580569, at *2 (Kan. Ct. App. 2007) (unpublished table decision) (noting that the interpretation of a written contract presents a separate question from whether a written contract has been modified). As the plaintiffs properly forecast in their argument, "it is well settled in Kansas that 'the terms of a written contract may

11

be varied, modified, waived, annulled, or wholly set aside by any subsequently executed contract, whether such subsequently executed contract be in writing or in parol.'" Car-X Serv. Sys., Inc., v. Kidd-Heller, 927 F.2d 511, 518 (10th Cir. 1991) (quoting Coonrod & Walz Constr. Co. v. Motel Enters., Inc., 535 P.2d 971, 979–80 (Kan. 1975)). "This is true even when the written contract contains a provision purporting to require that subsequent modifications be evidenced by a writing." Id. (citing Nichols & Shepard Co. v. Maxon, 92 P. 545, 546 (Kan. 1907)).

> The Supreme Court of Kansas has explained this "modification" doctrine:
>
> One party to a contract cannot unilaterally change the terms thereof. Modification requires the assent of all the parties to the contract. Their mutual assent is as much a requisite in effecting a modification as it is in the initial creation of a contract. Mutual assent may not only be shown by an express agreement, but also may be implied from the circumstances and conduct of the parties. In either case, however, there must be a meeting of the minds with respect to the proposed modification.

Fast v. Kahan, 481 P.2d 958, 961 (Kan. 1971).

Furthermore, the "agreement to modify a contract must be supported by independent consideration." Marsh v. Coleman Co., 774 F. Supp. 608, 616 (D. Kan. 1991) (citing Block v. Fedak, 499 P.2d 1052, 1054 (Kan. 1972)). "Courts should be slow to hold that written contracts have been modified by acts of the parties . . . ." Id. (internal quotation marks) (quoting Alexander v. Flick, 119 P.2d 464, 467 (1941)). "Kansas courts have generally reserved modification to those circumstances where the parties 'adopted a course of conduct to their mutual satisfaction different from that expressed in the original contract.'" Id. (internal quotation marks omitted) (quoting Fast, 481 P.2d at 962).

Some Kansas cases hold that this modification doctrine applies only to construction contracts. See, e.g., Boston Hannah Int'l, LLC v. Am. Acad. of Family Physicians, No. 10-2510-

12

CM, 2012 WL 137870, at *4 (D. Kan. Jan. 18, 2012); Fitzmorris v. Shaffer, 192 P.3d 185, 2008 WL 4291642, at *4 (Kan. Ct. App. 2008) (unpublished table decision). However, other cases tend to disagree with this characterization of the state of Kansas law. See, e.g., Car-X Serv. Sys., Inc., 927 F.2d at 518 (determining that a lease between a franchisor subtenant and a franchisee subtenant was modified by a subsequent agreement despite the fact that the original contract included a provision stating that it could not be modified except by a writing); Penncro Assocs., Inc., 2006 WL 1320252, at *11 (determining that written waiver and written modification clauses of a collection services contract would not preclude a finding of waiver or modification if "the parties routinely waived their rights . . . or made modifications to the terms . . . without regard to the clauses requiring that waivers or changes be made in writing."); Nichols & Shepard Co., 92 P. at 546 (determining that a contract for the sale of goods could be modified by a subsequent oral agreement despite the original contract's requirement that any subsequent agreements be in writing); Schafer, 2007 WL 2580569, at *3 (determining that a covenant not to compete was modified by the conduct of the parties despite a provision that the agreement could be amended only by a writing); see also 17A Am. Jur. 2d Contracts § 514 (noting that the rule followed by courts generally "is that unless a contract is required by law to be in writing, the contract can be modified orally, even though it provides that it can be modified only in writing").

Although the course charted by Kansas law on this issue appears less than clear, the court nonetheless is of the opinion that there is persuasive authority under Kansas law (including the case law cited above) supporting the proposition that an unambiguous written agreement (other than a construction contract) may be modified by a subsequent agreement, despite a written amendment provision in the original contract. As stated above, evidence in the instant case suggests that, during the parties' business relationship, each party provided arguably confidential

information to the other without marking it as such. The plaintiffs point to evidence indicating that the defendants' corporate representatives understood that the information they received from the plaintiffs, although not labeled as such, was intended to be treated as confidential and, furthermore, that the defendants instructed employees to treat the information as confidential. Hence, there are arguably facts from which a reasonable jury could determine that there was a meeting of the minds by the parties, evidenced by their course of conduct, to enter into an agreement to modify the Nondisclosure Agreement's clause regarding how information exchanged by the parties would qualify as "Confidential Information" under the contract. Car-X Serv. Sys., Inc., 927 F.2d at 518; Penncro Assocs., Inc., 2006 WL 1320252, at *11; Fast, 481 P.2d at 961; Nichols & Shepard Co., 92 P. at 546. Furthermore, there arguably was new consideration for this modification because, under the original contract, the parties were not required to maintain the secrecy of the other parties' information that was not marked as proprietary. Marsh, 774 F. Supp. at 616; see also Riley State Bank of Riley v. Spillman, 750 P.2d 1024, 1028 (Kan. 1988) ("[S]uch modification of a written contract must be supported by consideration independent and separate from the original consideration supporting the contract.").

Hence, the court concludes that there is a genuine issue of material fact as to whether the Nondisclosure Agreement's provision defining "Confidential Information" was amended or modified by the subsequent dealings of the parties. Schafer, 2007 WL 2580569, at *2 ("The question of whether a contract has been modified is a question of fact." (citing In re Estate of Snook, 38 P.3d 684 (Kan. 2002)); see also 17B C.J.S. Contracts § 1042 ("[Q]uestions regarding the modification of a contract are ones of fact, and are to be determined by the trier of fact upon

14

the evidence of the case."). For this reason, the court will deny the motion for summary judgment as to the breach of contract claim.

### 3. Unjust enrichment claim

As explained in greater detail in the court's memorandum opinion at the motion to dismiss stage (Docket No. 38 at 22–24), the defendants argue that the plaintiffs' unjust enrichment claim is preempted by both KUTSA and the express contract claim. Initially, the court notes that KUTSA does not operate to bar the plaintiffs' unjust enrichment claim because the benefit that the plaintiffs bestowed upon the defendants contemplates more than simply trade secrets (i.e., information that does not rise to the level of a trade secret and the "ancillary services" that the plaintiffs provided to the defendants during their relationship, including foreign translation services and marketing support). Wolfe Elec., Inc. v. Duckworth, 266 P.3d 516, 532–33 (Kan. 2011); Mediware Info. Sys., Inc. v. McKesson Info. Solutions, LLC, No. 06-2391-JWL, 2007 WL 926142, at *2–3 (D. Kan. Mar. 26, 2007); see also Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co., 191 F. Supp. 2d 652, 658–59 (E.D. Va. 2002) (asserting that, before reaching the preemption question, courts first "establish that the information in issue . . . constitute trade secrets").

The court determines that the express contract claim likewise does not operate to preempt the plaintiffs' unjust enrichment claim (although the existence of the contract limits the scope of the unjust enrichment claim) because the Nondisclosure Agreement does not "regulate[] the relations of the parties with respect to" the ancillary services that the plaintiffs provided to the defendants.[3] Ice Corp. v. Hamilton Sundstrand Inc., 444 F. Supp. 2d 1165, 1170 (D. Kan. 2006) (internal quotation marks and footnote omitted). As explained in the court's previous

---

[3] However, the court notes that the Nondisclosure Agreement does regulate the relations of the parties with respect to the disclosure of information exchanged by the parties pursuant to the contract. Ice Corp. v. Hamilton Sundstrand Inc., 444 F. Supp. 2d 1165, 1170 (D. Kan. 2006).

15

memorandum opinion, the Nondisclosure Agreement does not govern the parties' relations with respect to these services because the services were provided pursuant to the contract's "agreement to agree" provision, which the court determined to be unenforceable as part of the contract. See U.S. ex rel. W. Extralite Co. v. Mohan Constr., Inc., No. 11-cv-2491-JAR/KGG, 2012 WL 907088, at *3 (D. Kan. Mar. 15, 2012) (providing that a breach of contract claim will not preempt an unjust enrichment claim unless a valid contract governs the parties' conduct at issue in the unjust enrichment claim). In other words, the court concludes that a reasonable jury could find that the plaintiffs' provision of ancillary services to the defendants, which falls outside the purview of the Nondisclosure Agreement, bestowed a benefit upon the defendants under circumstances that would render inequitable the retention of that benefit.[4] Mediware Info. Sys., Inc., 2007 WL 926142, at *2–3. For these reasons, the court will deny the motion for summary judgment as to the unjust enrichment claim.[5]

### 4. Implied contract claim

As explained in greater detail in the court's previous memorandum opinion (Docket No. 38 at 14–22), the defendants argue that the plaintiffs' implied contract claim is preempted by their claim for breach of the Nondisclosure Agreement. Because the plaintiffs have

---

[4] The elements of an unjust enrichment claim under Kansas law are: (1) the conferral of a benefit by the plaintiff upon the defendant; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance by the defendant of the benefit under circumstances that would render inequitable the defendant's retention of the benefit without having paid for it. J.W. Thompson Co. v. Welles Prods. Corp., 758 P.2d 738, 745 (Kan. 1988).

[5] However, in so ruling, the court notes that the measure of damages under the unjust enrichment claim is limited to the damages related to the plaintiffs' provision of services to the defendants during the development of the application. On the other hand, the measure of damages in the breach of contract claim would contemplate both the defendants' profits from unauthorized sales and the consequential damages occasioned by the disclosure of the plaintiffs' confidential information, based upon the plaintiffs' admissions that unauthorized sales of the product falls under the umbrella of the Nondisclosure Agreement. (Docket No. 87 at 5.) Furthermore, the court notes, should the plaintiffs succeed on their KUTSA claim, the measure of damages "c[ould] include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." KUTSA § 60-3322. "In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." Id.

acknowledged that Beacon Europe is covered by the Nondisclosure Agreement's affiliates clause (Docket No. 87 at 3), the court will grant the motion for summary judgment as to the implied contract claim.

### III. Conclusion

For the reasons detailed above, the court will grant in part and deny in part the defendants' motion for summary judgment. Specifically, the court will grant the motion with respect to the plaintiffs' implied contract claim, and will deny the motion with respect to the remaining three claims. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 9th day of May, 2012.

_____
Chief United States District Judge